## Case No. 7,578.

### The JULIA BLAKE.

[16 Blatchf. 472.] [1]

Circuit Court, S. D. New York. July 16, 1879.[2]

MARITIME LIENS—REPAIRS TO VESSEL—BOTTOMRY BOND—LIEN ON CARGO—MASTER'S AUTHORITY—NOTICE TO OWNER.

1. The master of a vessel cannot hypothecate his cargo, by bottomry, without communicating with the owner of the cargo, if communication with such owner be practicable, and such communication must state not merely the necessity for expenditure, but, also, the necessity for hypothecation.

[Cited in The Edward Albro. Case No. 4,290; The C. M. Titus. 7 Fed. 831; Astsrup v. Lewy, 19 Fed. 541; The Thomas Fletcher. 24 Fed. 377; The L'Amerique, 35 Fed. 845.]

[See note at end of case.]

2. A vessel, with cargo. bound from Rio de Janeiro to New York, put into St. Thomas in distress. The master, to raise money to repair the vessel, gave a bottomry bond on vessel, freight and cargo. He had notice that C., at Philadelphia, was the consignee of the cargo. He made no communication to him, and no sufficient communication to the shipper of the cargo. He could have communicated with both of them by telegraph: *Held*, that the bond was void, as respected the cargo, for want of authority in the master to give it.

[Cited in Cunningham v. Switzerland Marine Ins. Co., 26 Fed. 47.]

[See note at end of case.]

[Appeal from the district court of the United States for the Southern district of New York.]

This was a libel in rem, in admiralty, filed in the district court against a vessel and her freight and cargo. on a bottomry bond. That court sustained the libel as to the vessel and freight, but dismissed it as to the cargo and the proceeds of certain copper and junk, with costs to the claimants of the cargo. The libellant appealed to this court from so much of the decree as was not in his favor. This court found the following facts: "The brigantine Julia Blake. Abraham Knowlton, master, left the port of Rio de Janeiro on or about the 31st of March, 1876. bound for the port of New York, having on board a cargo consisting of 582 logs of rosewood. The bills

of lading were three in number, and were drawn to the order of the shipper, James Philip Mee, of Rio de Janeiro, for 253, 139 and 100 logs respectively. Of this quantity about 200 logs belonged to the shipper, Mee, but the claimants had made advances on them to Mee. The remainder belonged to the claimants herein. The charter party was dated March 16th, 1876. Said Mee was named therein as the charterer, and the freight stipulated was the gross sum of £220 sterling, £110 of which sum was paid in advance. The master of the brigantine, on sailing, received from said Mee a letter of instructions, directing him to proceed to the port of New York and there consign his vessel and cargo to Winthrop Cunningham & Sons, Philadelphia, the claimants of the cargo herein, or their agents, and, if compelled by stress of weather, or other accident, to put into port, to consign the brigantine to persons named. at various points, and, among them, to Lamb & Co., at St. Thomas. The said brigantine was a British vessel, and was owned by Peter Blake, of Parsboro', Nova Scotia. Said brigantine proceeded safely on her voyage until the 3d or 4th of May, 1876, on one of which days [when with fair weather and with only a nine to ten knot breeze, owing to the rottenness of the masts and rigging, as the libelants admit][3] her rigging parted and her masts fell, the mainmast breaking at the saddle, about six feet from the deck, and the fore-mast at the head. The fallen spars and wreck remained for sometime alongside and thumping. before they could be cleared away. This accident made it imprudent to prosecute the voyage, and the master properly made for St. Thomas, as a port of distress. Said brigantine reached St. Thomas on the 27th of May, 1876. The master applied to the acting British consul, and said consul appointed a survey, consisting of three persons, the harbor master, the principal shipwright in St. Thomas, and the master of a vessel in port.

[3] [She had also leaked considerably during the whole voyage. The master was not examined, and the only witness to the incidents of the voyage, and the disaster which disabled the ship, are two of the seamen. I should have some hesitation in accepting their account of the cause of the dismasting of the vessel, as they seem to be not very trustworthy witnesses, but that the learned counsel for the libelants in support of the point that the repairs subsequently made at St. Thomas were necessary, concedes, and indeed insists, that the disaster was caused by the rottenness of the ship when she left Rio de Janeiro. It must be assumed, therefore, as a conceded point in the case that she was unseaworthy when she left that port. The effect of the accident was undoubtedly to make the further prosecution of the voy-

---

[1] [Reported by Hon. Samuel Blatchford, Circuit Judge, and here reprinted by permission.]

[2] [Affirmed in 107 U. S. 418, 2 Sup. Ct. 692.]

[3] [From transcript of the opinion of the district court as furnished by Hon. William G. Choate, late district judge.]

age imprudent, if not impossible, and the master very properly made for St. Thomas on or about the 26th day of May. Upon the application of the master the British consul appointed a survey, consisting of three persons, the harbor master, the principal shipwright in the place, and the master of a vessel in the port. On the 30th of May the surveyors reported the condition of the ship, the main mast, about six feet above the deck, gone, with all attached to it, foremast gone at the head, and everything attached to it, except the foreyard, jib boom and gear belonging to it, bowsprit started in the knight heads, head of capstain gone, upper works in bow started, tarpaulins from main hatch partly washed away, rudder-head twisted, part of top-gallant rail on port side split and part gone, the metal below the water bruised and torn off, from spars, &c., striking the bottom alongside at sea, and the ship leaking at the rate of twelve inches an hour in smooth water. The surveyors recommended the cargo to be discharged for further survey. It is insisted by the claimants that this survey is discredited by the testimony, especially by that of the two seamen, whose testimony goes to show, as it is claimed, that the sounding of the pumps was not fairly conducted; but in view of all the evidence in the case, including that which goes to discredit these two witnesses, I see no reason for withholding credit from the establishments of this survey so far as it purports to state the condition of the ship from observation. On one point, which is one of the contested points, the condition of her copper, the observation which the surveyors had opportunity of making, was very limited, as the vessel lay in the water with her cargo on board. It is true that the two surveyors who were examined, the harbor master, and the shipwright, show a surprising forgetfulness as to the condition of the vessel, considering that they were examined within ten months after the survey; but their testimony affirms the correctness and fairness of the survey and the third surveyor, a stranger in the port, was not examined as a witness. The cargo was discharged in accordance with the report of the surveyors, and upon the application of the master another survey was called by the British consul on the 8th day of June. Two of the surveyors, the harbor master and the shipwright, were the same as before, and the third surveyor was another shipmaster in port. They reported that she was still leaking at the rate of twelve inches an hour, that, on examining the top sides and poop deck, they found the seams and butts slack from working at sea, and they recommended, in order to put the vessel in a seaworthy condition, new spars complete, except bowsprit and foreyard, new standing and running rigging, new suits of sails, hatchway tarpaulins, hawser to replace one cut at sea, boat to be repaired, top-gallant rail to be repaired, bow and bowsprit to be refastened,

capstain-head to be replaced, rudder-head to be repaired, the vessel to be docked and stripped as the metal had been much broken and torn away by the floating wreck, to be re-calked throughout as required, and bottom to be re-metalled.] [3]

Said surveyors made a report on the 30th of May, 1876, of which a copy is in evidence. The pumps were carefully and fairly sounded upon such survey. The metal of the vessel below the water was not visible, except in places, and there it was more or less bruised and torn off. Said survey properly recommended a discharge of the cargo, and it was necessary to strip the vessel of her copper in order to stop the leaks. In consequence of said report, the cargo was discharged, and, on the 8th of June, 1876, a second survey was ordered by the consul upon application of the master. The surveyors were the same as before, with the exception of the surveyor described as a shipmaster in port, who was replaced by another shipmaster in port. A copy of the report of said second survey is in evidence. The said brigantine made as much water at the time of the second survey as she did at the time of the first, namely, twelve inches per hour. The surveyors examined the copper of the brigantine upon the second survey, as far as it was visible, and the statement in said survey, that the metal had been "much broken and torn away and ragged," was fully warranted by the facts. When the master arrived at St. Thomas, he went to several mercantile houses in St. Thomas, and seemed to be seeking a proper party to whom to consign said vessel, and finally went to Lamb & Co. and engaged them to attend to the business of the ship and the repairs. He did not show them his charter party and letter of instructions, but told them he had lost the same. Thereupon, the following correspondence passed between the parties in interest:

(1.) Telegram from Knowlton to Peter Blake, Parsboro', Nova Scotia. "Julia Blake, Saint Thomas, dismasted, leaky, consigned Lamb; sending survey mail. 29 | 5 | '76."

(2.) Copy of letter from Captain Abram Knowlton to Peter Blake, Esq., pressed in copy book of Lamb & Co. "S. S. Beta, via Halifax. Saint Thomas, 27th May, 1876. Peter Blake, Esq., Parsboro', Nova Scotia. Dear Sir: I regret to have to report that the brigantine Julia Blake, on her voyage from Rio de Janeiro, encountered heavy weather on the 4th inst., and, for the safety of lives, vessel and cargo, I was compelled to cut away masts to right the vessel, and to put into this port, as we were in a too disabled condition to go north. A survey will be held on Monday, and I will supplement this letter by a telegram acquainting you what the sur-

[3] [From transcript of the opinion of the district court as furnished by Hon. William G. Choate, late district judge.]

veyors recommend to be done in her present leaky and damaged state. It will likely be necessary to discharge, to ascertain damages, and for new masts, &c. This mail closes at once, so I must defer giving you full particulars until next steamer. I remain, sir, your obedient servant, Abram Knowlton." (3.) "French Frigate Minerve, via Philadelphia. St. Thomas, 13 June, 1876. Peter Blake, Esq., Parsboro,' Nova Scotia. Sir: We have to confirm Captain Knowlton's letter to you, dated 27th ult., acquainting you that the dismasted brigantine Julia Blake had put in here in a leaky and disabled condition. By surveyors' recommendation, the vessel has been discharged, and is to-day on the marine repairing slip, for shipping and caulking, &c.; masts, sails, ·&c, are being made, and in the course of another month the Julia Blake will probably be ready for sea in a seaworthy state. Captain Knowlton despatched you a telegram, thus: 'Julia Blake, Saint Thomas, dismasted, leaky, consigned Lamb; sending survey mail,' on the 29th ult., which, no doubt, reached you promptly and correctly. From his not receiving any reply from you, he concluded that you wish him to follow the customary routine with documents, &c. Meantime we hand, herein, certified copy of extended protest from the British consulate, which may interest you. No doubt your letters will state in what manner accounts here are to be paid. We remain sir, yours faithfully, Lamb & Co." (4.) "Alpha, via Halifax. St. Thomas, 22nd June, 1876. Peter Blake, Esq., Parsboro', Nova Scotia. Sir: We last wrote you on the 13th instant, via Philadelphia, with certified copy of extended protest per Julia Blake, which we trust has reached you safely. The S. S. Alpha arrived here to-day from Halifax, without bringing us any letter from you, but Captain Knowlton tells us that he had a communication, and we, therefore, refer you to him, or his advices, for particulars, in connection with the repairing and refitting of the brigantine Julia Blake. We suppose that your next will furnish instructions regarding funds for expenses here. If you don't provide the needful, same will likely be raised by bottomry and respondentia loan, payable on arrival at New York. The Julia Blake should be ready for sea about 15th proximo; and we remain, sir, your obedient servants, Lamb & Co." (5.) "St. Thomas, 20 July, 1876. Peter Blake, Esq., Parsboro', N. S. Dear Sir: We have to acknowledge the receipt of your valued favor of 4th instant, the contents of which claim our best attention. The Julia Blake is progressing with her repairs, and will soon be ready to take in cargo. We cannot, at present, give you any precise estimate of the expenses, as a good deal remains to be done yet; but Captain Knowlton is putting the vessel in first rate order, having at the same time regard to every practicable economy. The case being one of 'general average.' the cargo will, of course, contribute its proper proportion towards expenses, and we think the docu-

ments which Captain Knowlton will take with him will render the adjustment speedy and satisfactory to all the interests and parties concerned. We are, dear sir, yours faithfully, Lamb & Co." (6.) Copy of letter addressed to the shipper of cargo ex Julia Blake, at Rio. "Star Ball Steamer, from Porto Rico. St. Thomas, 1st June, 1876. Rio Janeiro: Dear Sir: We have to advise that the brigantine Julia Blake put in here on the 27th ult., dismasted and leaking. A survey has been held, and, for effecting repairs, &c., the cargo is being discharged. Captain Knowlton tells us· that he has cabled the casualty to the United States. As the cargo is consigned ·to order,' we have been unable to acquaint the New York consignees of the misfortune. We remain, yours faithfully, Lamb & Co." (7.) Copy of letter addressed to the shipper of cargo ex Julia Blake, at Rio. "Per S. S. Nile, via Southampton. St. Thomas, 28th September, 1876. Rio de Janeiro: Dear Sir: Your favor of the 13th July last reached us recently via Porto Rico, and only after the Julia Blake had sailed from this port. The letter of instructions which you mention having given to Captain Knowlton, on sailing from Rio, has never been laid before us, nor did he produce the charter party, although we repeatedly asked for it. He alleged that it had been mislaid or lost at the time of the disaster at sea, and, on being questioned, denied having any instructions from you as to the consignment of vessel in case of average. The bills of lading being 'to order,' left us no clue as to the consignees of cargo. The casualty was, however, at once cabled to the New York Board of Underwriters. While we regret that you should have felt any doubt as to our compliance with your wishes, it will now be clear to you how blameless we are in the matter. Whether Captain Knowlton purposely withheld information from us, or if he actually did lose the documents referred to, remains, at present, open for conjecture only, but the control intended to have been placed with us remained, in part, at least, in the hands of the captain, as master of the vessel. We would suggest that you advise us by mail of the despatch of all vessels conveying instructions from you to our firm. In the event of their putting into this port in distress, we would then, if necessary, be able at once to take up a position with the master, and the protection of your interests, at our hands, can then not be disputed or ignored. The adoption of such a course on your part is, we think, more advisable under present circumstantial means of mail communication between Rio and St. Thomas. We are, dear sir, yours, very truly, Lamb & Co."

During all the time that said brigantine was at St. Thomas, there was facility for telegraphic communication between St. Thomas and New York. There was telegraphic communication between St. Thomas and Rio de Janeiro, by way of New York, London, Lisbon and Pernambuco, from the

time said brigantine arrived at St. Thomas till the 21st of July, 1876. On the last mentioned date a break occurred in the cable between Bahia and Rio de Janeiro, but the Western Union Telegraph Company continued to transmit telegrams from New York to Bahia, and they were forwarded thence to Rio de Janeiro, the time required for transmission from New York to Rio de Janeiro being about five days. The lines of telegraph aforesaid were often employed by merchants and men of business in St. Thomas, and that from St. Thomas to New York was known to and used by the claimants. Immediately after the second survey the repairs on the ship commenced. The bills for the repairs and supplies to the vessel were paid by Lamb & Co., after being first certified as correct by the master. Some were paid to the master and some to the parties making the repairs and furnishing the supplies. On the 22d of July, 1876, the repairs were completed and the master advertised for proposals for a loan on bottomry and respondentia of the ship, freight and cargo, to the amount of $7,500 or thereabouts. The notice was extensively advertised and the libellant alone made a proposal. This was to loan the amount at a maritime interest of 14 per cent. The offer was accepted. Copies of the advertisement and tender are in evidence. Lamb & Co. made no inquiry as to the necessity of the repairs and supplies, but relied on the statement of the master. The discharging of the cargo was necessary in order to stop the leaks and so make the vessel seaworthy for a voyage to New York. The remetalling of the vessel was necessary to make her seaworthy for a voyage to New York. The repairs and supplies furnished were necessary to make the vessel seaworthy for a voyage to New York. The only inquiry made by the libellant was as to the sufficiency of the security in amount to satisfy the loan, and as to the regularity of the execution and attestation of the bottomry bond. When the matter came to be closed, the captain informed Lamb & Co. that a large amount of expenses had been incurred of which they had no previous information, and that the amount required to defray the expenses and their commissions and charges was $11,600. The libellant paid over the money, $11,600, on the captain's order, to Lamb & Co., and received the bond. The vessel left St. Thomas on August 5th, 1876. On her arrival in New York, payment of the bond above mentioned was demanded and refused, and the libellant libelled ship, freight and cargo. The ship was attached and sold by the marshal for about $4,500, and the proceeds remaining after paying off the crew and defraying cost of sale were paid into court. There was stored in the said vessel, at the time of the sale, a quantity of scrap copper and junk, consisting of old sails and ropes. The copper and junk were not sold with the vessel, but were afterwards sold and the proceeds were paid into court. The copper and junk were no part of the vessel or of her tackle, apparel and furniture. The value of the cargo in New York was about $18,000. The cargo was not perishable and would not have been injured by being stored under cover at St. Thomas for three or four months. St. Thomas is a central port where vessels go seeking business, and to which parties requiring vessels also go. Vessels for the shipment of merchandise are always available there. The rosewood aforesaid could have been forwarded from St. Thomas by vessels other than the Julia Blake, at an expense of from $1,000 to $1,500. It was for the interest of the owner of the said rosewood that it should be so forwarded, rather than that it should be hypothecated to pay for repairs to the Julia Blake. The libellant had the means of ascertaining the facts mentioned in the last four preceding sentences, before he made the loan in question."

The decision of the district court (Choate, J.) was as follows, so far as regarded the cargo:

The master, on his arrival at St. Thomas, instead of consigning his ship, as instructed, to Lamb & Co., went to several mercantile houses in the place and made inquiries, as if seeking a proper party to consign her to, and finally went to Lamb & Co., and engaged them to attend to the business of the ship and the repairs, which were made in accordance with the surveys, were made under their supervision, as agents of the vessel. The master told Lamb & Co. that he had lost his charter party and letter of instructions. There is no other evidence that he had lost them, but he failed to produce them to Lamb & Co. The master was not called as a witness, nor is his non-production accounted for, and from the testimony I feel called upon to look upon any statement made by him as very questionable. Even if he had lost his charter party and his letter of instructions, it is hardly credible that he should have forgotten to whom he was consigned at New York, and the fact that at St. Thomas he was consigned to Lamb & Co., yet he communicated neither of these facts to Lamb & Co., producing only to them the bills of lading which made the cargo deliverable to the order of the shipper, and gave no other clue to the consignee in the United States. Immediately on arrival at St. Thomas, the master wrote to Peter Blake, the owner of the vessel, at Parsboro', and subsequently Lamb & Co. and Blake corresponded on the subject of the disaster and the repairs; and this correspondence shows that the owner of the ship consented to the raising of funds by bottomry. On the 1st of June, Lamb & Co. wrote a letter addressed to "The Shipper of Cargo ex Julia Blake, at Rio," and sent the same by steamer to Rio de Janeiro, as follows: "Dear Sir: We have to advise that the brigantine Julia Blake put

in here on the 27th ult., dismasted and leaking. A survey has been held, and, for effecting repairs, &c., the cargo is being discharged. Capt. Knowlton tells us that he has cabled the casualty to the United States. As the cargo is consigned 'to order,' we have been unable to acquaint the New York consignees of the misfortune." It appears that the shipper of the cargo at Rio received this letter, although his reply was not produced; but, on the 13th of July, he wrote to Lamb & Co., as appears by a letter of Lamb & Co., dated September 28th, 1876, sent to the same address at Rio, in which they say: "Your favor of the 13th July last reached us recently via Porto Rico, and only after the Julia Blake had sailed from this port. The letter of instructions which you mentioned having given to Captain Knowlton, on sailing from Rio, has never been laid before us, nor did he produce the charter party, although we repeatedly asked for it. He alleged that it had been mislaid or lost at the time of the disaster at sea, and, on being questioned, denied having any instructions from you as to the consignment of vessel in case of average. The bills of lading being 'to order' left us no clue as to the consignees of the cargo. The casualty was, however, at once cabled to the New York Board of Underwriters. While we regret that you should have felt any doubt as to our compliance with your wishes, it will now be clear to you how blameless we are in the matter. Whether Captain Knowlton purposely withheld information from us, or if he actually did lose the documents referred to, remains, at present, open for conjecture only, but the control intended to have been placed with us remained, in part, at least, in the hands of the captain, as master of the vessel. We would suggest that you advise us by mail of the despatch of all vessels conveying instructions from you to our firm. In the event of their putting into this port in distress, we would then, if necessary, be able at once to take up a position with the master, and the protection of your interests at our hands can then not be disputed or ignored. The adoption of such a course on your part, is, we think, more advisable, under present circumstantial means of mail communication between Rio and St. Thomas. Capt. Knowlton was a disagreeable person, and incurred heavier expenses than we would have sanctioned, had he consulted us. He made accounts without our knowledge, and we only became aware of the large amount of expenses when the Julia Blake was actually ready for sea, on the same being rendered to us, with captain's signature on them, for payment, as consignees." Although Lamb & Co. were examined as witnesses and asked to produce all the correspondence with the shipper of the cargo, the letter of the shipper, of the 13th of July, was not produced nor its non-production accounted for, nor was any letter received by them, or the master, from the shipper, produced on the trial. This

is all that appears in the case, as to any correspondence with the shipper. From the contents of the letter of Lamb & Co., of September 28th, it may be inferred that the shipper of the cargo received and replied to their letter of June 1st on the 13th of July, and that he complained that they had neglected his interests. The great delay in the receipt of his letter of July 13th is not accounted for. The shipper of the cargo, immediately upon receiving the bills of lading from the master, sent them, endorsed by himself, to Winthrop Cunningham & Sons, of Philadelphia, who were the owners of the cargo, except about 200 logs, which belonged to Mee, the shipper at Rio. They received the bills of lading, together with a copy of the letter of instructions to the master and a copy of the charter party, before the arrival of the vessel at St. Thomas. Cunningham & Sons received no communication whatever from the master or Lamb & Co., and had no information of the disaster or repairs to the ship till her arrival in New York, except that they saw in the newspapers, about June 2d, a telegraphic item of news, that the vessel had put into St. Thomas, dismasted and leaky. During all the time that the vessel was in St. Thomas there was direct telegraphic communication between St. Thomas and New York, and there was also telegraphic communication between St. Thomas and Rio, by way of New York, London, Lisbon and Pernambuco, from the time of the arrival of the vessel at St. Thomas till the 21st of July, when the telegraphic line between Bahia and Rio was broken, and the communication was not re-established until after the ship left St. Thomas. Immediately after the second survey, which was made on the 8th of June, the repairs of the ship commenced. All the bills for the repair and disbursement of the vessel were paid by Lamb & Co., on being certified as correct by the master.

4 [The owners of the cargo contend that it is not proved that the repairs to the extent to which they were made were necessary. I think, however, the proof is complete that the vessel absolutely needed very extensive repairs, and that too of the nature of those which appear to have been made, except perhaps the remetalling, and it is also shown that it was necessary to discharge the cargo in order to repair her, but there is a noticeable failure in the libelant's proofs as to most of the items included in the bill of expenses incurred by the ship. With trifling exceptions, the material men and mechanics who testified to the correctness of their bills testify also to a total want of memory as to the actual condition of the vessel and as to the necessity for the expenditure of the labor and materials furnished by them, and Lamb

---

& Co., though they paid the bills, superintended the work in name only, and they testify that they have no knowledge or recollection as to the state of the vessel in detail or the necessity for the several items of expenditure, and though twice examined as witnesses they furnish no proof on this point. The captain, who alone really superintended the work, was not a witness, and his certification of the bills is not under the disclosures made by Lamb & Co., and the other evidence in the case as to his character, presumptive evidence of their correctness. There is absolutely no witness who saw the ship out of the water, who testifies to the condition of the metal or the necessity for replacing it, and on this point the surveys are of little value. But this defect of proof, while under the circumstances it leads to a suspicion that the bill of expenses may have been to some extent fictitious, could be remedied by further testimony, if necessary. The libel would not be dismissed, nor the items defectively proven rejected on that account, but a reference would be ordered, if necessary to give the libelants an opportunity to supply the defect. The Eureka [Case No. 4,547]. But for the purpose of disposing of the case, it will be assumed that repairs equal to or approximating the amount of the bills shown were necessary to render the vessel seaworthy. The whole amount of the repairs and outfit, including commissions and other expenses of Lamb & Co. was $11,600. The principal items were: Discharging and reloading cargo, $594; storing cargo, $400; shipwright, $3190.21; metal, $1042.21; sailmaker, $1215; iron work, $493.20; use of ways, $259.20; riggers, $345; commissions and other charges of Lamb & Co., $1123.81; ship chandlery, $1725.34.] [4]

* * * From this statement it will be seen, as might have been inferred from the description of the injuries to the vessel in the surveys, that a very large part of the expenses was incurred for the permanent repair of the vessel, and, as such, ultimately chargeable exclusively upon the ship, in an adjustment as between ship and cargo. On the 22d of July, the repairs being then completed, the master advertised for proposals for a loan on bottomry and respondentia of the ship, freight and cargo, to the amount of $7,500 or thereabouts, to liquidate the expenses incurred in landing, storing and reshipping the cargo, and to defray the cost of her repairs and outfit. The notice was extensively advertised, and the libellants, the Bank of St. Thomas, alone, made a proposal: They offered to make the loan at a maritime interest of 14 per cent. The offer was accepted and a bond on ship, freight and cargo executed therefor. The libellants made no inquiry whatever, except to satisfy themselves that the security offered

was sufficient in amount for the loan. They paid over the money, $11,600, on the captain's order, to Lamb & Co., who had paid the bills, and they received the bond. The vessel left St. Thomas on the 5th of August. By the Danish law, in force in St. Thomas, material men and mechanics, who supply a foreign ship, and a party advancing the funds to pay the same, can attach the vessel and cargo, to satisfy their claims. [On the arrival of the ship in New York, payment of the bond was demanded and refused and the Bank of St. Thomas libelled ship, freight and cargo for the payment of the bond. The ship was attached and sold by the marshal for about $4,500, and the proceeds, after paying wages of the crew and expenses of sale, have been paid into court. The amount in the registry from the sale of the ship is about $3,500. The total amount of the freight by the charter party is £220.] [5]

* * * The value of the cargo in New York is about $18,000. The cargo was practically imperishable, not liable to decay or deterioration, except from long exposure to sea water. Upon these facts, the principal question is, whether the bond is void as against the cargo, for the reason that no sufficient communication was had with the owner of the cargo, before the hypothecation of it was made. It is conceded that the amount of the repairs and expenses of the ship at St. Thomas cannot be brought below the value of ship and freight, and that sufficient notice was given to the owner of the ship, and, therefore, that the bond is valid as against ship and freight, but the owners of the cargo contend that the master was not, under the circumstances of this case, justified in pledging the cargo without communicating with its owner, and that the communication in fact had with the shipper at Rio was not sufficient, either as regards the character of the communication, or the time when it was made, or as regards the person with whom it was had. There are, in fact, two questions here—first, whether the master had the power to hypothecate the cargo for these repairs, without communication with its owner; secondly, whether the libellants, as lenders, stand in any better position, in this respect, than the master. Recent English decisions have, certainly, established the rule in that country, that the master, before hypothecating the cargo for the repair of the ship, must communicate with the owner of the cargo, if such communication is practicable under the circumstances. The Bonaparte, 8 Moore, P. C. 459; The Hamburg, 1 Brown. & L. 253, 265; The Karnak, L. R. 2 Adm. & Ecc. 289, L. R. 2 P. C. 509; The Onward, L. R. 4 Adm. & Ecc. 38; Cargo ex Sultan, Swab. 504; The Cassa Marittima, L. R. 2 App. Cas. 156. It is clear, that, by these decisions, so far as the

---

[4] [From transcript of the opinion of the district court, as furnished by Hon. William G. Choate, late district judge.]

[5] [From transcript of the opinion of the district court, as furnished by Hon. William G. Choate, late district judge.]

English courts of admiralty are concerned, the same rule that has long been applied as to the necessity of communication between the master and the owner of the ship, to justify a bottomry bond, is now applied as between the master and the owner of the cargo, to justify a bond that binds the cargo. But, it is claimed by the learned counsel for the libellants, that this is distinctively an English rule and a new rule even in England, that it has never been adopted in this country, that it is difficult of application and impracticable, and that it is not and ought not to become a rule of general maritime law. In one American case some doubt has been expressed as to whether these English cases truly represent the general maritime law. The Eureka [Case No. 4,547]. That sometimes and under some circumstances the master has no authority to hypothecate the cargo, without communicating with the owner, is certainly not a new doctrine in the English courts of admiralty. It was very plainly declared by Sir William Scott, in his very justly celebrated opinion in The Gratitudine, 3 C. Rob. Adm. 240, 259, 266. In that case, the principle is laid down and enforced by argument and illustration, that the master is not generally the agent of the owner of the cargo to dispose of or hypothecate it, but only to carry and deliver it according to the contract of affreightment, and that he becomes such agent to dispose of or hypothecate it only from the necessity of the particular case. From this it seems to result, that, if the owner is at hand in the same port, for instance, or easily reached, there is not, in the particular case, any such necessity made out. If this is so, it must always be a subject of inquiry, whether, under the circumstances of the particular case, the action of the master in hypothecating the cargo was justifiable and reasonably necessary. It is not necessary, in this case, to determine whether, in the form in which this rule as to communication with the owner of the cargo has been stated by the English courts, or in the stringency of their rulings as to the character of the notice to be given, they have gone to a length which seriously and injuriously impairs the power of the master to raise money on ship and cargo in a foreign port, as the learned counsel for the libellants contends. The rule, as stated in the case of The Hamburg, and as very justly applied to the particular facts of that case, is certainly reasonable, and seems to be entirely in harmony with the case of The Gratitudine, thus: "If according to the circumstances in which he is placed, it be reasonable that he should—if it be rational to expect that he may—obtain an answer within a time not inconvenient with reference to the circumstances of the case, then it must be taken, upon authority and principle, that it is the duty of the master to do so, or at least to make the attempt." The supposed inconvenience of the rule is no greater than exists in all other cases where the authority of the master to act for the ship or cargo depends upon the particular circumstances of the particular case, of which there are so many familiar instances. Like all similar rules, it is to be reasonably applied. It is urged, as a reason why such communication should not be required, that the owner of the ship has the right to repair and to carry on the cargo to its port of destination, if he elects to do so, instead of transhipping the cargo; that, therefore, the owner of the cargo, could, if notified, only save the maritime interest, by furnishing the money himself; and so, it is further claimed, that, if communication is necessary, the want of it affects only the claim for maritime interest, and that for the principal sum loaned, with interest, the cargo is bound. This argument rests upon the theory, that the owner of the cargo cannot reclaim his goods at an intermediate port; and that the ship has an absolute right to carry them to the end of the voyage, and so to earn her freight. But, the right of the shipper, even in a case where nothing has happened to dissolve the contract, to demand his goods upon payment of full freight at an intermediate port, and an indemnity to the ship against loss and damages, seems hardly to be denied, even in the case cited in support of this proposition. Palmer v. Lorillard, 16 Johns. 348, per Chancellor Kent. See, also, The Onward, supra. The contract of affreightment, though a contract mutually binding, establishes the relation of principal and agent, of bailor and bailee, between the shipper and the ship; and, however such a contract might be dealt with by a common law court, it seems not according to the declared principles of equity upon which admiralty courts deal with questions, that the shipper of goods should be denied the right to their possession while in the custody of his agent, if he is willing to pay that agent all that he could possibly receive upon the full performance of the contract. There may be cases where it would be equitable that the ship should receive more than the freight, as, for instance, if the re-delivery of the goods will impose an additional expense on the ship, as, for ballast, or for the re-stowing of cargo, or the like. See The Nathaniel Hooper [Case No. 10,032]. That the owner of the goods can reclaim them at an intermediate port, at least by payment of full freight, and on indemnifying the ship against all loss arising from their being so reclaimed, seems, therefore, to result from their ownership and the nature of the contract. Why, then, should he not have, equally with the owner of the ship, notice of extraordinary expenditures, involving the cargo as well as the ship, and why should he not have, when the circumstances admit of it, an opportunity to exercise this option to reclaim his goods, on fair terms? On this point, see 1 Pars. Shipp. & Adm. 231, and notes. But, whatever may be the rule generally, in the present case the right of the owner of the cargo to reclaim his goods can-

not be denied, for, it is conceded that the vessel sailed on the voyage in an unseaworthy condition, in violation of the warranty of seaworthiness contained in the charter party. To deny his right to retake the goods under these circumstances would be the most manifest injustice. The argument, therefore, drawn from the supposed right of the ship to complete the voyage, wholly fails, as applied to this case.

Then, recurring to the particular circumstances of this case, we find the facts to be substantially as follows: The master had full notice that the consignee of the cargo was at Philadelphia. Even if it be true that he had lost his letter of instructions, of which there is not sufficient proof, it is not to be presumed, in the absence of evidence, that he had forgotten the name and address of the consignee to whom he was to deliver the cargo at the end of his voyage. He knew the name and address of the shipper at Rio de Janeiro. He knew, or must be presumed to have known, that the ship sailed on the voyage in an unseaworthy condition, as to her spars, sails, rigging and hull, and that she was in need of very extensive and permanent repairs. There is no evidence as to the value of the ship, except her sale in New York, at $4,500. The master must be presumed to have known, not precisely, but approximately, her value, and very little inquiry as to the probable cost of repairs would have shown that they would far exceed the value of the ship. The cargo was imperishable and easily stored and preserved and the port was one from which the owner could readily find means of transportation to the United States. There was telegraphic communication between St. Thomas and the United States, at trifling cost. So, also, there was, up to the 21st of July, during which time, if ever, the master was bound to communicate, telegraphic connection with Rio, by which, through the shipper, the master could have obtained all necessary information for communicating with the owners of the cargo, if he had forgotten who they were. If, by his own negligence, he had lost the name and address of his consignee, then he was bound to use this means of recovering them, and the expense proved, of about $5.25 gold a word, seems to furnish no reason why this means of repairing the consequences of his own negligence should not be employed. But, there is really no evidence to show that he did not know how to communicate directly with his consignee, all the time. Under these circumstances, to hold the master justified in hypothecating the cargo for the repair of the ship, without notice, would be contrary to the admitted principle which makes him only the agent of the owner of the cargo for that purpose in a case of necessity; for, no such necessity exists where the owner is himself thus, by means of the telegraph or the mail, so close at hand. Again, the master is bound, in acting as agent for ship and cargo, to consult, so far as he can, the true interests of both. He must not sacrifice the cargo to the ship. Now, here, he acted in flagrant violation of the rights and interests of the owner of the cargo. Knowing the condition of the ship, he must be presumed to have known that it was not the interest, and would not be the wish, of the owner of the cargo to contribute a large part of the value of the cargo for the purpose of enabling the ship, which was disabled by its own unseaworthiness at the commencement of the voyage, and not by a peril of the sea, to be repaired, in order to complete her voyage. His acts, as agent of the owner of the cargo, were not reasonably judicious, and, I am bound to say, on all the evidence, were not done in good faith. The Onward, ut supra. The letter sent on the 1st of June, by Lamb & Co., to Mee, at Rio, does not help the master's case. Assuming that it has the same effect as if written by him, it was sent by some roundabout way, so that it did not reach Mee till July 13th. It did not convey any definite information as to the probable cost of the repairs, nor indicate that it would be necessary to hypothecate the cargo. Moreover, Mee was not the party with whom the master was bound to communicate, although he happened, so far as appears, without the master's knowledge, to be the owner of a small part of the cargo. It must be held, therefore, that, under the circumstances of this case, the master was not justified by necessity, in hypothecating the cargo. This case is strikingly like the case of The Hamburg, cited above, with some added circumstances of recklessness, negligence and bad faith, and many of the arguments of the learned counsel for the libellants in this case, as to the impracticable character of the rule requiring communication, are met and fully disposed of in the opinion in that case. The point taken, that, by the Danish law, the cargo was already liable at St. Thomas, and that, therefore, the bond is good, is also clearly disposed of by that case and the other English cases cited. That the libellants advanced their money in good faith is not questioned; but that they made no inquiries whatever, except as to the sufficiency of the ship, freight and cargo, to secure the amount of the bond, is admitted. A lender upon bottomry, who makes reasonable inquiries of the proper parties, as to the facts which are essential to justify the master's action in hypothecating the ship, may have a good security, though misinformed as to the facts. This is in the interest of commerce, and secures the masters of ships in distress in foreign ports reasonable means of obtaining funds to refit and continue the voyage. There is no reason why the same principle should not apply to the hypothecation of the cargo. But, the validity of the bond, if upheld in such a case, depends wholly on the fact, that the lender made such reasonable inquiry, and,

as the result of it, obtained information which, if true, would sustain the action of the master. The interests of commerce do not require that the same protection should be extended to lenders who do not inquire, though they may lend their money in good faith, believing that the master had the necessary authority. Indeed, the interests of commerce are not aided, but impaired, by having such facilities for borrowing money within the reach of the master. If he makes no inquiries, the lender must stand or fall by the facts as to the master's authority. Making no inquiries, he must be presumed to know what the master knows. On this point, see The Hamburg, ut supra, and cases cited; Maclachlan, Merch. Shipp. p. 51. At the least, the lender is chargeable with notice of the facts that he could reasonably be expected to discover on inquiry, and, in this case, he certainly could have been expected to discover enough to satisfy him that no communication was had or attempted with the owner, though especially necessary under the particular circumstances. In this case, therefore, there must be a decree in favor of the libellants against the ship and freight, and in favor of the cargo against the libellants.

6 [The old metal and junk taken from the ship at St. Thomas were brought in her to New York. They have been sold by the marshal and the proceeds paid into court. It is claimed that they are part of the ship or cargo and covered by the bond. These things had ceased to be part of the ship when the bond was given. They are the property of the owners of the ship, but in no sense a part of her, either actually or constructively like the tackle, apparel and furniture being adapted and designed for use upon her. The cargo described in the bond is 582 logs of rosewood. They are not within that description. This claim is disallowed.

[As to the amount of freight attached, it appears to be $450.12 gold. I do not see why the deduction of $185.50 for interest on the value of the cargo should be deducted. The libelants are entitled to costs against the owner of the ship, and the claimants of the cargo against the libelants. Decree accordingly.

[Aug. 16, 1878.] 6

George De Forest Lord, for libellants.
Everett P. Wheeler and Butler, Stillman & Hubbard, for claimants.

BLATCHFORD, Circuit Judge. The only appeal taken in this case is one by the libellant, and is from so much of the final decree of the district court as dismisses the libel as against the cargo and the proceeds of the copper and junk, and as awards costs to

6 [From transcript of the opinion of the district court, as furnished by Hon. William G. Choate, late district judge.]

the claimants of said cargo. The only question made, in argument, by the counsel for the libellant, is as to the cargo as no attempt has been made to show error as to the decree respecting the proceeds of the copper and junk.

There is no dispute as to the material facts in this case, as affecting the cargo. Those facts, as found by this court, were substantially found by the district court, in its decision. The only question is, whether, on the facts of this case, the cargo is bound by the bond. The point involved is examined with care and thoroughness in the decision of the district court, and I concur in the views there set forth. I have read the English decisions on the subject, namely, The Gratitudine, 3 C. Rob. Adm. 240, before Sir William Scott, in the high court of admiralty, in 1801; La Ysabel, 1 Dod. 273, before the same judge, in the same court, in 1812; The Oriental, 3 W. Rob. Adm. 243, before Dr. Lushington, in the same court, in 1850, reversed by the privy council in 1851 (7 Moore, P. C. 398); The Bonaparte, 3 W. Rob. Adm. 298, before Dr. Lushington, in the high court of admiralty, in 1850 and 1852, and before the privy council twice, on appeal, in 1851 and 1853 (8 Moore, P. C. 459); Cargo ex Sultan, before Dr. Lushington, in the high court of admiralty, in 1859 (Swab. 504); The Hamburg, 1 Brown. & L. 253, before the same judge, in the same court, in 1863, and before the privy council, on appeal, in 1864 (Id. 265); The Karnak, L. R. 2 Adm. & Ecc. 289, before Sir Robert Phillimore, in the high court of admiralty, in 1868, and before the privy council, on appeal, in 1869 (L. R. 2 P. C. 509); The Onward, L. R. 4 Adm. & Ecc. 38, before Sir Robert Phillimore, in the high court of admiralty, in 1873; and Kleinwort v. The Cassa Marittima, L. R. 2 App. Cas. 156, before the privy council, in 1877. The result of these cases is, that it is the law of England, in regard to a bottomry bond covering cargo, given by the master of the vessel, that he cannot hypothecate the cargo without communicating with the owner of it, if communication with such owner be practicable, and that such communication must state not merely the necessity for expenditure, but also the necessity for hypothecation. In The Onward, L. R. 4 Adm. & Ecc. 55, Sir Robert Phillimore states it to have been the judgment of the privy council in The Oriental, 7 Moore, P. C. 411, that a mere statement of injuries done to the ship, and of the consequent necessity of repairs, which would entail considerable expense, unaccompanied by a statement that a bottomry bond must be had recourse to, was not a sufficient communication to the owners. This statement of the law is quoted in the judgment of the court in Kleinwort v. The Cassa Marittima, above cited, with the remark, that the privy council entirely agrees in such view of the law. No case in the United States is cited deciding the points thus referred to. In The

Eureka [Case No. 4,547], it was doubtful whether it was open, on the pleadings, to take the objection that the master did not write sufficiently to the owners of the ship, and not at all to the owners of the cargo, and the conclusion of the court was, that, if the English cases were of authority here, they would not require the bond to be set aside.

In the present case, the point is taken in the answer of the claimants of the cargo, that the vessel, at the time she was in St. Thomas, was consigned to the claimants in New York, as owners of her cargo, and that she had been consigned in St. Thomas to the agents of the claimants there, as was well known to her master; that means of speedy communication with the owner of the vessel, and with the claimants, as owners of her cargo, as also with the charterer of the vessel and the shipper of her cargo, existed and were well known to said master and to the libellant, and that, although such means existed, said master did not communicate with the owner of the vessel, nor with the claimants, nor with either of them, relating to the execution of said bottomry; that said master had no authority or necessity for the execution of the same, as was well known to the libellant; and that the said bond, having been executed without such authority or necessity therefor, is void as against the vessel and her cargo.

The rule laid down in the case of The Hamburg, 1 Brown. & L. 273, by the privy council, as deduced from the judgment of the privy council in the case of The Bonaparte, 8 Moore, P. C. 473, is, that "if, according to the circumstances in which he is placed, it be reasonable that he should—if it be rational to expect that he may—obtain an answer within a time not inconvenient with reference to the circumstances of the case, then it must be taken, upon authority and principle, that it is the duty of the master to do so, or at least to make the attempt." As to this rule, the privy council say, in The Hamburg, that they are unable to discern any novelty in it, either in the principle on which it rests, or in its application to the case of the hypothecation of the cargo of a ship by the master; that the question, whether a master must communicate or not, is one which can only be decided by the circumstances in each particular case; and that this principle was recognized by Sir William Scott in The Gratitudine. They further say: "As to the supposed inconvenience of the rule, their lordships do not forget that the lender of the money is the party interested in the event of the suit, and not the master. But there is no hardship in requiring from one who is about to advance a large sum of money under such circumstances, that he should enquire of the master whether he has communicated, or made an attempt to communicate, to the owners the circumstances of his distress and what he proposes to do in regard

to their goods. And it must be remembered, on the other hand, that the owners of the goods are equally interested, and, unless communicated with, have not the same means of protecting their own interests, which the lender undoubtedly has. If it be said that a decision in their favor will tend to increase the difficulty of procuring loans in foreign ports for the repair of vessels in distress, it may also be said, on the other hand, that it will tend very much to the benefit of commerce in general, to discourage improvident or fraudulent advances." The reason for communicating with the owners of the cargo is well expressed by the privy council in the case of The Hamburg, in this language: "The character of agent for the owners of the cargo is imposed upon the master by the necessity of the case, and by that alone. In the circumstances supposed, something must be done, and there is nobody present who has authority to decide what shall be done. The master is invested, by presumption of law, with authority to give directions, on this ground—that the owners have no means of expressing their wishes. But, when such means exist, when communication can be made to the owners, and they can give their own orders, the character of agent is not imposed upon the master, because the necessity which creates it does not arise." In the case of The Lizzie, L. R. 2 Adm. & Ecc. 254, Sir Robert Phillimore, citing as authority, the cases of The Gratitudine, The Bonaparte, and The Hamburg, says, that, if there be an opportunity for the owners of the cargo to express their will as to advancing the requisite funds, or as to unlading their cargo altogether, the master, who is the agent of necessity and not of their choice, has no right to deprive them of this opportunity, and, therefore, must communicate with them, if it be reasonably within his power to do so. In the case of The Onward, L. R. 4 Adm. & Ecc. 38, the same judge says: "When the circumstances permit, the master must communicate with the owner before he does any acts which seriously affect the value of the ship in the one case, or of the cargo in the other. This is a doctrine at which the English courts have slowly but steadily arrived." This rule of the English courts seems entirely reasonable, and one which should be applied to the present case.

The master had notice that Cunningham & Sons were consignees of the cargo, at Philadelphia. He made no communication to them. He might have done so by telegraph at all times, and have received a speedy answer. He made no communication to Mee. The letter of June 1st, 1876, from Lamb & Co. to Mee, was sent by such a route that it did not reach him till July 13th. It contained no information as to the amount of the damage to the vessel, or as to the cost of the repairs, nor did it suggest bottomry. No other communication was made to Mee. Before July 21st, a telegram would have reach-

ed him at once, and, after that date, in about five days. But the master was told, by his letter of instructions, that Cunningham & Sons were the consignees of the whole of the cargo, and thus the proper persons to be communicated with; and, if he had lost his letter of instructions, and had forgotten the name and address of the consignees, he could have learned both by communicating, by telegraph, with Mee. The newspaper notice of the disaster to the vessel, which the claimants saw on June 2d, was not such a notice as called upon them to act. It conveyed no suggestion that a hypothecation of the cargo was probable or intended. The other points involved, growing out of the special circumstances of this case, are fully discussed and properly disposed of, in the opinion of the district court.

As the suit is wholly upon the bond, and as the bond is void, as respects the cargo, for want of authority in the master, acting as agent for the owners of the cargo, to give it, it follows that the bond cannot be sustained against the cargo, to any extent.

[NOTE. In his opinion affirming this decree, in the supreme court, Mr. Chief Justice Waite says: "The master can neither sell nor hypothecate the cargo, except in case of urgent necessity, and his authority is no more than can reasonably be implied from the circumstances in which he is placed. * * * But at all events the necessity must be such as to connect the act with the success of the voyage and not for the exclusive interest of the ship-owner. * * * It is equally well settled that a lender upon the hypothecation of the cargo by the master is chargeable with notice of the facts on which the master appears to rely as a justification for what he is doing." The learned chief justice holds that it was necessary in order to bind the cargo by the bottomry bond that communication should have been made to the owners of the cargo, and after an explanation to them of the circumstances of the case, their consent secured to the proposed action. No excuse is given why this was not done, and telegraphic communications were open with St. Thomas for nearly two months before the loan was advertised for. After commenting upon the condition of the vessel when she left Rio de Janeiro, and the unseaworthy condition which she was then evidently in, the learned chief justice further says: "From these facts it is, to our minds, apparent that when the vessel arrived at St. Thomas she ought not to have been repaired, at the risk of expense to the owner of the cargo, without his consent, and that this could have easily been ascertained by an inquiry into the facts. She came in, dismasted and leaky, for a general equipment and refit, with a cargo substantially imperishable, which might be forwarded in another vessel at comparatively small expense, and it must have been easy to see that to repair the vessel at the risk of the owner of the cargo would be to place his interests in jeopardy without any urgent necessity on his account. No master who held the balance evenly between his two principals could have believed himself justified, under the circumstances, in hypothecating the cargo for any such purpose without notice to the owner." Bank of St. Thomas v. The Julia Blake, 107 U. S. 418, 2 Sup. Ct. 692.]