## The C. M. Titus.

*(District Court, S. D. New York.   January 22, 1881.)*

1. REPAIRING VESSEL—HYPOTHECATING CARGO—NOTICE TO OWNER OF CARGO—SALVAGE—COLLUSION.

   Where a master and owner of a canal-boat verbally agreed with the libellant to pump her out and repair her leaks, having run her aground to avoid sinking, between Fourth and Fifth streets, Hoboken, where she lay within the line of the ends of the piers on a muddy bottom, and where she could remain safely two or three days without further damage, and out of the track of other vessels, the cargo consisting of iron, not likely to be injured; and neither of them consulted the shipper or consignee, although the master had two days before contracted with the shipper in New York to deliver the cargo at the Delaware, Lackawanna & Western Railroad dock in Hoboken, and had already reported his arrival to the consignee; and the libellant, after partially completing the work and moving the boat to the Elysian Fields, demanded payment of the shipper in New York, but was refused, the underwriters claiming that the master acted without authority; and the libellant then finished the work of caulking and patching her up, and after procuring from the master a written agreement for the services, dated back to the day of his employment, and a written protest before a notary, also antedated, charging the leak-

ing to improper loading, filed his libel against both vessel and cargo, but voluntarily released the former before decree, and the boat was afterwards discharged and took other employment without undergoing repairs :

*Held,* that the rule which requires the master to communicate with the owners of the cargo, if practicable, before hypothecating or contracting for a lien upon it for extraordinary expenses necessary to enable him to continue the voyage, (*The Julia Blake,* 16 Blatchf. 472,) applies to a service of this character; that the necessity for such services, which in each case is governed by the peculiar circumstances attending it, was not so pressing or immediate as to preclude the master in this case from consulting the shipper before employing the libellant; and that the latter, who presumably could have learned on inquiry who and where the shipper or owner was, having failed to make such inquiry, is bound by the facts as they were and cannot recover.

Whether the services in this case can properly be regarded as salvage, *query.*

*Held, further,* that as a salvage claim the libellant's demand, which was for 96 hours' services, was grossly exaggerated, as the boat could have been pumped out and made tight in a few hours, and that the circumstances of the case tend to show collusion between the libellant and the owner of the boat prejudicial to the interests of the owner of the cargo, and entitle the libellant's claim against the latter to no consideration whatever in a court of admiralty, and on this ground the libel should be dismissed, with costs

In Admiralty.

*E. D. McCarthy,* for libellant.

*J. A. Bush,* for claimant.

CHOATE, D. J.    This is a libel for salvage against the canal-boat C. M. Titus.    It is defended only by the owners of the cargo.    The facts are as follows:    May 22, 1879, one William D. Marvel, having his place of business in the city of New York, engaged the canal-boat C. M. Titus to take a cargo of iron ore from the steamship Greece, then lying at pier 39, North river, (New York,) to Hoboken, to be there discharged along-side a railroad dock.    This agreement was made with the master of the boat at Marvel's office in Nassau street, New York.    The master owned the boat.    On the twenty-third of May the canal-boat received 135 tons of iron ore from the steamship Greece, and her master signed a bill of lading therefor, agreeing to deliver the same at the "D. L. & W. R. R. dock, Hoboken," along-side, to the order

of "L. J. & C. Co." upon payment of freight "as agreed,"
"the dangers of the seas only excepted." This was not a
full cargo, but the boat was leaking and the master refused
to take any more. Having received this amount of cargo the
canal-boat proceeded on the same day to the place of dis-
charge, and reported at the office of the company to whose
order she was consigned. She was obliged to await her turn
to discharge, and the master found she was leaking so badly
that he feared she would sink if she remained there till she
could discharge. The cause of her leaking is attributed by
the master to the careless and improper way in which her
cargo was put on board, and to her not being properly trimmed.
To save her from sinking the master took her, with her cargo
on board, to a dock in Hoboken, between Fourth and Fifth
streets, where he ran her aground at high tide, stern fore-
most. There she was lying at the time of the rendering of
the alleged salvage service. She was within the line of the
ends of the piers and not in the track of vessels. She was
lying on a muddy bottom. At high tide she had between
two and three feet of water in her. The captain and his
wife were able to remain on board, the water not reaching
the floor of her cabin. Her bows were not submerged at
high tide. The master, with the help of some extra hands,
and with two pumps, was unable to keep her clear of water
at high tide. She was run aground on Friday, the twenty-
third of May. On Saturday, the twenty-fourth of May, a
little after 12 o'clock, the master came over to New York to
see the libellant and to engage his assistance. The libellant
is engaged in the business of wrecking and of assisting ves-
sels in distress, having a vessel equipped with a steam-pump
and other appliances therefor. In the afternoon of the same
day, Saturday, the master found the libellant and made an
agreement with him, verbally, for the use of his vessel and
steam-pump, with her crew, at the rate of $3.50 an hour.
The master, before making this agreement, had no commu-
nication with Marvel, the skipper, nor with the company to
whose order she was consigned, with reference to the situa-

tion of the canal-boat. The libellant made the agreement with the master without making any inquiries as to who was the owner, shipper, or consignee of the cargo, or where such shipper, owner, or consignee was, and without seeing the boat, or having any knowledge of her situation except what was reported to him by the master. Having made this verbal agreement the libellant sent his vessel and steam-pump and crew to the canal-boat, and they arrived there about 5 o'clock Saturday afternoon. She had then been lying there about 24 hours. They pumped her out in about two hours. They then hauled her higher up and in along-side the pier. The pump was kept by her, pumping occasionally. On Monday morning they removed her to the Elysian Fields. I think, upon the evidence, the reason why they removed her was because the libellant had another vessel there which he was taking care of, and for which he needed his pump and crew. After getting her afloat the libellant's men and the master did some caulking, but she still leaked. On Monday the master and the libellant went to see the shipper, Marvel, and the libellant demanded that he should pay his bill for the use of the pump. The shipper referred him to the underwriters on the cargo, and the agent of the underwriters took the ground that the master had no authority to bind them or the owner of the cargo by the agreement made, and refused to pay the bill. After seeing them the libellant obtained from the master a written contract, signed by the master, dating it back to May 24th, as follows:

"This agreement, made this twenty-fourth day of May, 1879, by and between George Donahue, master and owner of the canal-boat C. M. Titus, of the first part, and E. R. Lowe, of the city of New York, of the second part. The party of the first part, in behalf of owners, underwriters, and all concerned in both boat and cargo, agrees to pay E. R. Lowe the sum of $3.50 per hour for each and every hour that the steam-pump Relief is at work on the said canal-boat C. M. Titus; the said steam-pump Relief is to be along-side and keep the said canal-boat afloat until she is discharged. The said E. R. Lowe not to be held responsible for any loss or damage to boat and cargo of any nature or kind. Witness our hands and seals this twenty-fourth day of May, 1879.

"GEO. DONAHUE.
"E. R. LOWE."

After the refusal of the shipper and the underwriters to settle the bill, the master also, at the suggestion of the libellant, entered a protest before a notary, having it dated back to May 24th, and charging the leaking of the boat to improper loading and trimming. After other ineffectual efforts to induce the underwriters to pay his bill, the libellant gave orders to his men on Wednesday, May 28th, to patch the canal-boat up, make her tight, and leave her, which they did on Wednesday evening. The leak was no longer serious. She was afterwards taken to the place of her destination by the aid of a tug-boat and discharged. Afterwards, and without any repairs, she carried a cargo of coal. Before the libellant left her on Wednesday he had filed his libel against the canal-boat and cargo for 96 hours, at $3.50 per hour, making $336, coming down to a time later than the filing of the libel. There is some testimony from the libellant's witnesses that, in their opinion, the nature of the bottom where the canal-boat lay in the dock where she was run aground was such that she was in danger of sliding off into deep water. The evidence, however, to this point is very slight. The libellant himself, who testifies to this, did not see her there, and his foreman made no such examination as entitled his opinion to any weight, and I think the fact is not established. She had, at the time of the making of the agreement, lain there over two high tides, and was, of course, settling some in the mud, and there is no satisfactory testimony that the bottom was shelving, so as to render her sliding at all probable.

The libellant himself testified that the canal-boat was not worth more than $75 as she lay aground. There is no proof of the value of the cargo, but it may be assumed to have been worth much more than the boat as she lay. The cargo was not damaged by water. The testimony shows that the price named, $3.50 an hour, is a reasonable price for the use of the steam-pump and appurtenances; that if the employment is only for a few hours a higher price would be reasonable.

On these facts I doubt whether the service rendered can properly be considered a salvage service; but, even if it was

a salvage service, the necessity for it was not so pressing and immediate that the master had not ample time and opportunity to communicate with the owner of the cargo before calling in the assistance of the libellant. · The general rule undoubtedly is that the power of the master to bind or hypothecate the cargo for extraordinary expenses, proper or necessary to enable him to continue the prosecution of the voyage, arises only from the necessity of the case. His power over the cargo is primarily to carry it, not to sell or hypothecate it. It is an exigency unprovided for in the contract of affreightment, which clothes him with power, as the agent of its owner, to sell or bind it as security for extraordinary expenses in the prosecution of the voyage. And on this ground, if it be practicable under the circumstances in which he is placed, the master is bound to communicate with the owners of the cargo before he can hypothecate it, or incur such expenses as will give a lien on the cargo. *The Julia Blake*, and cases cited, 16 Blatchf. 472.

I see no reason why this principle should not apply to a service of this character under the circumstances in which this master was placed. His boat was in no appreciable present peril. The cargo was one not liable to be damaged by salt water. The boat could lie where she was in entire safety for two or three days without being liable to further damage. She was not sunk in a navigable channel, as in the case of *The John C. Churchill*, 7 Ben. 343.

The libellant, having made no inquiries, is bound by the facts as they were. It is to be presumed that if he had inquired he would have learned who and where the owner of the cargo was. No doubt there are frequently cases of sunken or sinking canal-boats where the necessity for aid both to boat and cargo is so pressing as not to admit of communication with the owners of the cargo before engaging assistance, though they be close at hand,—cases where any delay involves the risk of damage. In such cases the master's power to act as agent of the owner of the cargo arises, and it is his duty to act at once. Every case depends on its own circumstances,

and this is not such a case. Even if this was a salvage case the boat and her cargo were rescued from the peril, or could have been so rescued in a few hours. She would have been perfectly safe if the patching and caulking finally done on Wednesday had been done on Sunday or Monday morning. As a salvage claim the libellant's demand has been grossly exaggerated. He contrived, with the aid of the master, an antedated agreement to sustain his claim after it was disputed; and instead of doing what he now pretends was necessary to make the salvage service complete at once, he delayed doing it till he could, if possible, coerce the owner of the cargo into compliance with an unreasonable demand. He is apparently acting with the owner of the boat to throw the expense wholly on the owner of the cargo.

Although the boat was also attached on the process, she has been voluntarily released, and no decree has been entered against her. The circumstances tend to show collusion between the owner of the boat and the libellant, although they deny any understanding prejudicial to the interests of the owner of the cargo. The acts of both these parties have been highly prejudicial to those interests. If the libellant ever had a claim for salvage he is entitled to no consideration therefor in a court of admiralty, but has forfeited his right to enforce it against the property. *The Lady Worsley*, 2 Spinks, 256.

Libel dismissed, with costs.